UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MLB PLAYERS INC.,<br><br>        Plaintiff,<br><br>   v.<br><br>UNDERDOG SPORTS, INC., d/b/a Underdog Fantasy, UNDERDOG SPORTS, LLC, UNDERDOG SPORTS WAGERING, LLC,<br><br>   and<br><br>FANDUEL INC.,<br><br>        Defendants. | Case No.   1:24-cv-7958 |

**NOTICE OF REMOVAL**

PLEASE TAKE NOTICE that pursuant to 17 U.S.C. § 301; 28 U.S.C. §§ 1331, 1337, 1338, 1441(a), 1446, 1454; and 29 U.S.C. § 185, Defendant FanDuel Inc. hereby removes this action from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York.  After filing this Notice of Removal, FanDuel Inc. will promptly serve written notice of this Notice of Removal on counsel for all parties and file the same with the Clerk of the Supreme Court of the State of New York, County of New York in accordance with 28 U.S.C. § 1446(d).  The state court docket index and true and correct copies of all process, pleadings, and orders served on the Defendants in the action prior to removal are attached hereto as Exhibits A–F.

In support of this Notice of Removal, FanDuel Inc. states the following:

**GROUNDS FOR REMOVAL**

I.   **BACKGROUND**

    A.   **Parties And Relevant Non-Parties**

    1.   Non-party Major League Baseball ("**MLB**") is an unincorporated association of 30 professional baseball clubs ("**Clubs**") that does business through the Office of the Commissioner of Baseball ("**Commissioner's Office**") and various corporate entities including non-parties MLB Advanced Media, L.P., Major League Baseball Properties, Inc., and The MLB Network, LLC.

    2.   Non-party Major League Baseball Players Association ("**MLBPA**" or the "**Union**") is the labor union for individual professional baseball players ("**Players**") and is the sole and exclusive bargaining representative for the Players in connection with collective bargaining over the terms and conditions of their employment with the Clubs.

    3.   Plaintiff MLB Players Inc. ("**MLBPI**") is the for-profit subsidiary of MLBPA and is responsible for managing all commercial activities of the Union, including its group licensing program, pursuant to which it licenses to third-parties certain group publicity rights of Players (the "**Group Licensing Rights**").

    4.   Defendant FanDuel Inc. operates fantasy sports contests through www.fanduel.com and related mobile apps (collectively "**FanDuel Fantasy**"). Fantasy sports contests are non-wagering games of skill in which players use their skill and knowledge of relevant professional sports information and fantasy sports rules to accumulate the most fantasy points based on the performance of individual athletes in sports events. FanDuel Fantasy is not a sportsbook and does not allow users to place bets on sporting events.

    5.   Non-party Betfair Interactive US LLC ("**FanDuel Sportsbook**"), part of the same corporate family as FanDuel Inc., controls and operates the website www.sportsbook.fanduel.com and mobile, tablet, and other FanDuel Sportsbook apps (collectively the "**FanDuel**

2

**Interactive Sportsbook**").

6. Defendants Underdog Sports, Inc., d/b/a Underdog Fantasy, Underdog Sports, LLC, and Underdog Sports Wagering, LLC (collectively "**Underdog**") is a digital sports fantasy and gambling company, offering daily fantasy sports and online sportsbook betting.

7. Underdog and FanDuel Inc. have no corporate relationship; Underdog is a direct competitor of FanDuel Inc. and non-party FanDuel Sportsbook.

B. <u>Relevant Agreements</u>

1. *The Major League Baseball Collectively Bargained Basic Agreement*

8. In March 2022, MLB and the MLBPA signed the 2022–2026 Basic Agreement that sets forth their agreement on certain terms and conditions of employment of all Players through December 1, 2026 ("**Basic Agreement**").

9. Included in the Basic Agreement is the collectively bargained Uniform Player's Contract ("**UPC**"), which is the required form contract that Players and Clubs are required to use to formalize their individual employment relationships. Under the Basic Agreement, if a Club and a Player enter into a contract that is "inconsistent with the terms of [the Basic Agreement], the provisions of [the Basic Agreement] shall govern."

10. Section 3(c) of the UPC (Pictures and Public Appearances) provides:

> The Player agrees that his picture may be taken for still photographs, motion pictures or television at such times as the Club may designate and agrees that *all rights in such pictures shall belong to the Club and may be used by the Club for publicity purposes in any manner it desires*. The Player further agrees that during the playing season he will not make public appearances, participate in radio or television programs or permit his picture to be taken or write or sponsor newspaper or magazine articles or sponsor commercial products without the written consent of the Club, which shall not be withheld except in the reasonable interests of the Club or professional baseball.

(Emphasis added.) "The language of paragraph 3(c) has remained materially unchanged" since 1947. *Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 671 (7th

3

Cir. 1986).

11. The Basic Agreement also includes "Major League Baseball's collectively bargained sports betting and other legal gaming policy." While the MLB's rules have long banned betting on baseball, the Clubs and the Players agreed that "additional rules are required to safeguard [baseball] as legalized sports betting becomes more pervasive." Section I.G. of the policy (Activities for and Grants of Rights to Legal Sports Gaming Companies) provides, in relevant part:

> Major League Players may engage in promotional or endorsement activities (e.g., licensing the use of the Major League Player's name, image, likeness, and other personal attributes (collectively, "Attributes") in advertisements or making personal appearances) on behalf of, may promote or endorse, and may license use of his Attributes in or in connection with a third party engaged in, or products that involve or enable (e.g., video games that enable sports betting or contain components of daily fantasy sports), <u>legal</u> betting (including, without limitation, casinos, racetracks, purveyors of Fantasy Baseball Games, sportsbooks, lotteries, or any other entity that offers or accepts wagering relating to sporting events or otherwise) (a "Sports Gaming Company"); <u>provided that</u> (i) the promotional activity and/or licensed use of Attributes is otherwise permitted by and consistent with the Basic Agreement, Major League Rules, and the Major League Player's UPC; <u>and</u> (ii) ***the Player does not authorize or allow the use of his name, uniform number, image, likeness, or any other Attributes in order to advertise, promote, or encourage betting on (for or against) any Baseball Game(s) or Baseball Event(s), or any event(s) or outcome(s) related in any way to Baseball Games or Events*** (including, without limitation, betting on a Club's season or partial season win/loss records; end of season awards voting; or any other in-game or in-season "prop bets" associated with Clubs or players) (collectively, the "Permitted Activities and Grants").

(Underlining in original, bold and italics added.)

### 2. *The MLBPA Use and Licensing Authorization Agreement*

12. As part of the MLBPA's efforts to monetize Players' publicity rights, the Union asks each Player to execute a licensing authorization agreement called a "Use and Licensing Authorization Agreement" or "**ULA**." If a Player executes a ULA, that Player

> grants and assigns to the MLBPA the exclusive, worldwide rights to use, and to license, sublicense and otherwise transfer or assign (including to a subsidiary or

4

other related entity of MLBPA) the use of (collectively, to "Use and License") his names, nicknames, signatures (or facsimile thereof), biographical information, numbers, playing records, performance data, voice, image, likeness, performances, publicity rights, and any other personal attributes (collectively, "Rights") in any form, media or size, including but not limited to drawings, paintings, photographs, motion pictures, television, and other audio, video, visual and/or other content (including digital, virtual, online, offline or otherwise, and such media, assets, channels and content now known or hereafter developed), to be marketed commercially, alone or in connection with products or services, in any manner when any Rights of a total of three (3) or more individuals who sign or have signed a ULA or similar authorization (each a "Player") are licensed or used, whether individually, collectively, separately, concurrently or otherwise (referred to, collectively, as the "Group Rights"). MLBPA may Use and License Rights, as described herein, both during this ULA's term and, for purposes of all secondary sales and transactions, after this ULA expires.

13.     To carry out the MLBPA's group licensing activities, the Union has designated MLBPI as its exclusive licensing agent for the Group Licensing Rights, granting MLBPI the authority to negotiate, administer and/or manage the MLBPA's group licensing program.

### 3.     *The MLB-FanDuel Agreements*

14.     Since August 13, 2019, FanDuel Sportsbook has been an MLB Authorized Gaming Operator pursuant to the MLB Authorized Gaming Operator Parent Company Agreement ("**Gaming Operator Agreement**") entered into between MLB Advanced Media, on behalf of itself, the Commissioner's Office, and Major League Baseball Properties, on the one hand and FanDuel Sportsbook on the other.  Among other things, the Gaming Operator Agreement authorizes FanDuel Sportsbook to identify itself publicly as an "MLB Authorized Gaming Operator" using MLB's official betting data.

15.     The Gaming Operator Agreement additionally authorizes FanDuel Sportsbook to use, display and publish MLB's league and Club marks, logos, and related intellectual property within the FanDuel Interactive Sportsbook and any physical FanDuel Sportsbook locations in connection with the operation of such a physical sportsbook.

16. In connection with the Gaming Operator Agreement, FanDuel Sportsbook has entered various additional commercial agreements with MLB entities, including an MLB License Agreement.

17. The MLB License Agreement authorizes FanDuel Sportsbook to use official Player headshots provided by MLB Advanced Media (the "**MLB Headshots**"), including for navigational purposes, within the FanDuel Interactive Sportsbook.

18. The MLB License Agreement represents that all rights, title and interest in and to "all trademarks, service marks, copyright, patent or other proprietary assets, however denominated owned, controlled, first used and/or applied for in and/or registered with the U.S. Patent and Trademark Office and/or the Copyright Office" associated with the MLB Headshots "belong to the applicable MLB Entities," defined as:

> [MLB Advanced Media], the [Commissioner's Office], its Bureaus, Committees, Subcommittees and Councils, the [Clubs], Major League Baseball Properties, Inc., The MLB Network, LLC, each of their parent, subsidiary, affiliated and related entities, any entity which, now or in the future, controls, is controlled by or is under common control with the Clubs or the [Commissioner's Office] and the owners, general and limited partners, shareholders, directors, officers, employees and agents of the foregoing entities.

In other words, MLB owns all rights in the copyrighted MLB Headshots.

19. On information and belief, the MLB Headshots are created by and at the direction of the Clubs from still photographs of Players taken by or at the direction of each Player's Club pursuant to guidelines established by MLB. These photographs are then selected and manipulated by the Club and/or MLB Advanced Media or another MLB entity, including to ensure uniformity and consistency across Players and Clubs and to conform to the MLB Style Guide. MLB Headshots are additionally digitally manipulated to alter uniforms, caps, and logos, e.g., when a Player changes team.

20. Defendant FanDuel Inc. and non-party FanDuel Sportsbook have also jointly entered into a Promotional Rights Agreement with MLB Advanced Media on behalf of itself, Major League Baseball Properties, the Commissioner's Office, The MLB Network, and the Clubs.

21. Among other things, the Promotional Rights Agreement grants FanDuel Inc., subject to various terms, conditions, restrictions, and limitations, rights to use certain MLB intellectual property "for promotional purposes" in connection with FanDuel Fantasy. The Promotional Rights Agreement grants the same rights to FanDuel Sportsbook in connection with the FanDuel Interactive Sportsbook.

22. FanDuel Inc. lacks knowledge as to what, if any, agreements Underdog has entered into with MLB entities addressing similar matters as are addressed by the Gaming Operator Agreement, the MLB License Agreement, and the Promotional Rights Agreement.

C. **MLBPI's Suit Against FanDuel Inc. And Underdog**

23. On September 16, 2024, MLBPI initiated the present action in the Supreme Court of the State of New York, County of New York by filing a summons and complaint (Ex. B) naming FanDuel Inc. and Improperly Joined Defendant Underdog Sports, Inc. FanDuel Inc. was served with Plaintiff's initial complaint on September 19, 2024. Ex. C at 1.

24. On September 23, 2024, MLBPI filed its amended complaint (Ex. E) ("**Complaint**"), which was substantially the same as the initial complaint but added the additional Underdog defendants. FanDuel Inc. was served with the Complaint that same day. *See* Ex. F at 1)

25. The Complaint purports to state a single claim for relief against FanDuel Inc. and Underdog for "Misappropriation of Rights of Publicity" under New York Civil Rights Law §§ 50–51. Compl. ¶¶ 41–49. MLBPI alleges that it has standing to assert this claim because it purports to hold "the right and license to use the [Group Licensing Rights], including the right to

grant sublicenses of those rights," and "to prosecute claims and suits in its own name to protect those rights." *Id.* ¶ 43.

26. MLBPI alleges that Underdog and FanDuel Inc. misappropriated the Group Licensing Rights by "knowingly and without consent us[ing] the images of three or more MLB [P]layers within their respective sportsbook betting platforms." *Id.* ¶ 45. Specifically, MLBPI alleges that FanDuel Inc.—which as noted above, does not operate a sportsbook—and Underdog use the MLB Headshots "in connection with prop bets" on their respective interactive sportsbooks, including for navigational purposes, without the written consent of MLBPI. *Id.* ¶¶ 28–32, 47.

27. MLBPI additionally alleges that Underdog misappropriated the Group Licensing Rights by "knowingly and without consent us[ing] the names, images, and likenesses of three or more MLB [P]layers for the purposes of promoting and advertising its sportsbook platform." *Id.* ¶ 46. Specifically, MLBPI alleges that Underdog uses the MLB Headshots and other images of Players "in advertising for its sportsbook platform," including on Underdog's various social media accounts, without the written consent of MLBPI. *Id.* ¶¶ 36–38, 47.

## II. THIS COURT HAS ORIGINAL JURISDICTION OF MLBPI'S CLAIM

28. This Court has federal-question jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."), 1337 ("The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies[.]"), and 1338 ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . copyrights . . . .").

29. "The presence or absence of federal-question jurisdiction is governed by the well-

pleaded complaint rule, which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (cleaned up). However, the "complete pre-emption doctrine" provides a "corollary" to the well-pleaded complaint rule: "Once an area of state law has been completely pre-empted [by a federal statute], any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.* at 393 (cleaned up).

### A. MLBPI's Claim Is Completely Preempted By The Copyright Act

30. Section 301 of the Copyright Act, 17 U.S.C. § 301, completely preempts state law claims that are equivalent to a claim arising under the Copyright Act. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004). Although "[c]opyrightable material often contains uncopyrightable elements within it," § 301 of the Copyright Act preempts "state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements" of a copyrightable work. *NBA v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997). To determine whether a state law claim is preempted by the Copyright Act, the Second Circuit applies a two-prong test consisting of (1) the "subject matter" requirement and (2) the "general scope" or "equivalence" requirement. *Jackson v. Roberts (In re Jackson)*, 972 F.3d 25, 42–43 (2d Cir. 2020).

31. The subject matter prong "looks at the work that would be affected by the plaintiff's exercise of a state-created right, and requires (as an essential element of preemption) that the work 'come within the subject matter of copyright as specified by sections 102 and 103.'" *Id.* at 42 (quoting 17 U.S.C. § 301(a)). This "test is satisfied when the plaintiff's claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 301 (2d Cir.

2022) (cleaned up). The Copyright Act defines copyrightable works of authorship to include "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5).

32. The second, "general scope" or "equivalence," prong "looks at the right being asserted (over a work that comes within the 'subject matter of copyright') and requires (for preemption to apply) that the right be '*equivalent* to any of the exclusive rights within the *general scope of copyright* as specified by section 106.'" *In re Jackson*, 972 F.3d at 43 (quoting 17 U.S.C. § 301(a)) (emphasis supplied). "[S]tate law rights are equivalent to those within copyright's general scope," and thus preempted, "when those state law rights may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided in Section 106." *Id.* (cleaned up). "[E]xtra elements . . . beyond what is required for copyright infringement" shield a state law claim from preemption, but only if those extra elements "change the nature of the action so that it is qualitatively different from a copyright infringement claim." *Id.* at 43–44 (cleaned up).

33. MLBPI's claim satisfies the subject matter requirement because the MLB Headshots are copyrightable—and copyrighted—"pictorial" or "graphic" works consisting of photographs taken at the direction of the Clubs pursuant to the MLB Style Guide and then digitally manipulated by an MLB Entity, including to ensure uniformity, consistency, and, as necessary, to alter Club or other MLB marks, e.g., when a Player changes Clubs.

34. MLBPI's claim also satisfies the equivalence requirement. As the Second Circuit has recognized, "[c]ourts have invoked § 301 [of the Copyright Act] to justify preemption of right of publicity claims, notwithstanding the contentions of the plaintiffs that their suits were directed against unauthorized use of their names or likenesses, on the conclusion that the invocation of the publicity right was a pretextual justification for an effort to prevent or otherwise control the reproduction or dissemination of a copyrighted work." *In re Jackson*, 972 F.3d at 46. Such is the

case here as "the predominant focus of [MLBPI]'s claim is [FanDuel Inc.'s alleged] unauthorized use of [the] copyrighted [MLB Headshots] that [MLBPI] has no legal right to control." *Id.* at 39.

35. Accordingly, MLBPI's claim is completely preempted by § 301 of the Copyright Act and this Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338. Removal is therefore proper under 28 U.S.C. § 1454.

### B. MLBPI's Claim Is Completely Preempted By The Labor Management Relations Act

36. Additionally, and as an alternate basis for this Court's original jurisdiction, § 301 of the Labor Management Relations Act ("**LMRA**"), 29 U.S.C. § 185, completely preempts state law "claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar*, 482 U.S. at 394 (cleaned up). "Thus, when resolution of a state law claim is 'substantially dependent' upon or 'inextricably intertwined' with analysis of the terms of a CBA, the state law claim 'must either be treated as a [LMRA] § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Whitehurst v. 1199SEIU United Healthcare Workers East*, 928 F.3d 201, 206 (2d Cir. 2019) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 220 (1985)). A state law claim is "independent" of a collective-bargaining agreement, and therefore not preempted by the LMRA, "when resolving it 'does not require construing the collective-bargaining agreement.'" *Id.* at 207 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988)).

37. Both MLBPI's standing and the merits of its claim substantially depend upon and are inextricably intertwined with the terms of the Basic Agreement. MLBPI purports to have standing to bring its claim for misappropriation of the Players' rights to publicity associated with the MLB Headshots based on the Players alleged assignment of those rights to it through the Union. Compl. ¶¶ 11, 26, 43, 49. However, the Players—through the actions of the Union—have

11

collectively bargained away the rights asserted. Specifically, § 3(c) of the UPC grants the Clubs "all rights" in the MLB Headshots, including the right to use them "for publicity purposes in any manner [the Clubs] desire[]." In turn, the Clubs, through MLB Advanced Media, have granted FanDuel Sports Book the right to use the MLB Headshots on its Interactive Sportsbook. Moreover, even if the Players retained any rights as to the MLB Headshots, they have agreed to forego the right to license their publicity rights in connection with betting on baseball under § I.G. of the collectively bargained sports betting policy.

38. Accordingly, MLBPI's claim is completely preempted by § 301 of the LMRA and this Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1337. Removal is therefore proper under 28 U.S.C. § 1446(a).

### III. VENUE IS PROPER

39. Venue is proper in this district under 28 U.S.C. § 1454(a) because this Court is the district court of the United States for the district and division embracing the place where the action is pending. Additionally, and in the alternative, venue is proper in this district under 28 U.S.C. § 1446(a) for the same reason.

### IV. REMOVAL IS TIMELY

40. This Notice of Removal is timely filed under 28 U.S.C. §§ 1454(b) and 1446(b) because it has been filed within 30 days after September 19, 2024, the date of service of the initial complaint on FanDuel Inc.

### V. UNDERDOG HAS CONSENTED TO REMOVAL

41. Although consent of Underdog is not required for FanDuel Inc.'s removal of this action—including because unanimity is not required under 28 U.S.C. § 1454(b)(1) and because FanDuel Inc. and Underdog are not "properly joined" as defendants to this action (28 U.S.C. § 1446(b)(2)(A); *see* Fed. R. Civ. P. 20(a)(2)(A); N.Y. C.P.L.R. § 1002(b); *Pampillonia v. RJR*

*Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998))—FanDuel Inc. has sought and obtained Underdog's written consent to removal, attached hereto as Exhibit G.

## VI. FANDUEL INC. RESERVES ALL RIGHTS

42. By removing this action, FanDuel Inc. does not waive any claims, arguments, or defenses available to it or to FanDuel Sportsbook and does not admit any of the allegations in the Complaint or concede that the Complaint pleads any claim upon which relief may be granted. FanDuel Inc. expressly reserves all rights to assert any such claim, argument, or defense.

43. Additionally, by removing this action, FanDuel Inc. does not waive any right to compel arbitration of MLBPI's claims. FanDuel Inc. expressly reserves all rights to compel arbitration.

44. FanDuel Inc. reserves the right to supplement or amend this Notice of Removal to add other grounds for removal that may become apparent as a result of any amended complaint filed by MLBPI or otherwise. FanDuel Inc. further reserves the right to submit at an appropriate time and under appropriate confidentiality protections documentation, evidence, affidavits, or other factual material to support the foregoing grounds for removal, should that become necessary.

## CONCLUSION

WHEREFORE, Defendant FanDuel Inc. respectfully gives notice that this action is hereby removed from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.

Dated: October 18, 2024
       New York, New York

Respectfully submitted,

/s/ *Scott E. Lerner*

Tara M. Lee
Scott E. Lerner
Anna B. Naydonov (*pro hac vice* forthcoming)
Benedict S. Bernstein (*pro hac vice* forthcoming)

**WHITE & CASE LLP**
701 Thirteenth Street, NW
Washington, D.C. 20005
Telephone:     + 1 202 626 3600
Facsimile:     + 1 202 639 9355
tara.lee@whitecase.com
scott.lerner@whitecase.com
anna.naydonov@whitecase.com
benedict.bernstein@whitecase.com

*Counsel for Defendant FanDuel Inc.*