# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MLB PLAYERS INC.,

                          Plaintiff,

                          v.

UNDERDOG SPORTS, INC., d/b/a Underdog Fantasy, UNDERDOG SPORTS, LLC, UNDERDOG SPORTS WAGERING, LLC, and FANDUEL INC.,

                          Defendants.

Index No. 654809/2024

**AMENDED COMPLAINT**

      Plaintiff MLB Players Inc. ("MLBPI"), by its undersigned attorneys for its Complaint, alleges as follows:

### NATURE OF THE ACTION

      1.    This action is brought by MLBPI against Defendants Underdog Sports, Inc., Underdog Sports, LLC and Underdog Sports Wagering, LLC (together, "Underdog") and FanDuel Inc. ("FanDuel") (collectively, "Defendants"), leading sports gambling companies, based on their knowing and deliberate misappropriation of the images and likenesses of hundreds of Major League Baseball ("MLB") players for their own commercial purposes on their sportsbook betting online and mobile platforms and Underdog's use of MLB players' names, images, and likenesses in associated advertising, without the consent of MLBPI.

      2.    Underdog and FanDuel, founded in 2020 and 2009, respectively, both began primarily as providers of daily and weekly fantasy sports in the U.S. While traditional fantasy sports are premised on users building a team of professional athletes and earning points based on the players' real-world statistical performance over the course of a season, in daily and weekly

1

fantasy sports, users can win contests on the same day that they enter. Fantasy sports are generally considered to be games of skill that are not regulated as sports betting.

3. When states within the U.S. became free to legalize sports betting following a 2018 U.S. Supreme Court ruling, both Underdog and FanDuel launched their sportsbook platforms in U.S. states that legalized sports betting, allowing their users to wager on the outcome of sports competitions as well as place specific bets on individual player performances (commonly referred to as "prop bets").

4. On information and belief, FanDuel has been granted certain rights to use the names, images, and likenesses of MLB players on promotional materials for its products, subject to certain limitations and MLBPI's approval rights. FanDuel has *not* been granted the right to use the names, images, or likenesses of any MLB players within its FanDuel Sportsbook platform (as opposed to promotional materials).

5. Despite not being licensed by MLBPI to use MLB player images within their sportsbook platforms, FanDuel and Underdog have, upon information and belief, since early 2024 featured dozens of such images prominently throughout their online and mobile FanDuel Sportsbook and Underdog Sportsbook betting platforms, respectively. Nearly every active MLB player's image is displayed on Defendants' websites and mobile apps.

6. MLB player names, images, and likenesses are also featured prominently in advertising on Underdog Sportsbook's social media, without authorization, including in posts encouraging users to place bets on the featured player and offering promotions for betting on featured players.

7. Defendants' use of player images within their sportsbook platforms is not merely informational—it is promotional. Users could bet that the Mets will beat the Reds, or that Pete

2

Alonso will hit more than two home runs in a given game, without seeing Alonso's valuable image. Indeed, both FanDuel and Underdog offer the same types of bets in other sports without using player images. For example, despite the fact that the 2024-25 football season just began, neither platform features images of National Football League ("NFL") players. And there is no other purpose for using popular MLB player names and images in advertising other than to increase the consumer appeal of the apps and draw users to make bets on the platforms, particularly given that the core information that bettors need in order to make informed decisions about placing sports bets is statistical data.

8. Defendants' use of MLB player images on their sportsbook betting platforms and use of player names and images in associated advertising, without a license for such use, is a flagrant violation of New York's right of publicity statute, N.Y. Civ. Rights § 50. As such, MLBPI brings this action to recover compensatory and punitive damages, and to prevent Defendants' further willful misappropriation of those players' names and identities.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over the parties pursuant to CPLR § 301 because FanDuel and Underdog are domestic corporations authorized to conduct business in the State of New York, and both companies maintain their respective principal places of business in the state. In addition, pursuant to CPLR § 302, personal jurisdiction is proper because Defendants transact business within the state, use or possess real property within the state, and committed a tortious act within the state.

10. Venue is proper in this Court pursuant to CPLR § 503 because both MLBPI and FanDuel maintain their principal places of business in New York County and because a substantial

part of the events giving rise to MLBPI's claims against FanDuel and Underdog occurred in New York County.

## PARTIES

11. Plaintiff MLBPI is the corporate subsidiary of the Major League Baseball Players Association ("MLBPA"), which represents MLB players in collective bargaining with MLB and in other matters affecting the players' economic and privacy interests. MLBPI, as assignee of the right to use the names, images, and likenesses of three or more MLB players in a calendar year, negotiates and enters into group licensing agreements with companies throughout the world, to authorize when appropriate the use of the baseball players' names, images, and likenesses in commercial products and sponsorships under specifically negotiated terms and conditions. MLBPI is the exclusive group licensing agent for all active MLB players, and it possesses the exclusive right to use, license and sublicense those players' names, images, and likenesses for any commercial marketing, promotional activity, or product in which the MLB players' group licensing rights are implicated.

12. Defendant FanDuel is a corporate subsidiary of its publicly traded NASDAQ parent corporation, Flutter (FLUT). FanDuel is organized under the laws of the state of Delaware with its principal place of business in New York, New York. FanDuel is a gambling company that offers online and retail sportsbook betting, daily fantasy sports, online and retail horse race betting, and online casino, among other products. Among these products is the FanDuel Sportsbook platform, available online and in an app, which allows users to place bets on virtually any professional sport or athlete in states where such betting is legal, including New York.

13. Defendant Underdog Sports, Inc. is a privately held corporation organized under the laws of the state of Delaware with its principal place of business in Brooklyn, New York.

4

Defendants Underdog Sports, LLC and Underdog Sports Wagering, LLC are limited liability companies organized under the laws of the state of Delaware with their principal place of business in Brooklyn, New York. Underdog is a digital sports gambling company, offering daily fantasy sports and online sportsbook betting. Underdog's sportsbook betting products are offered through its Underdog Sportsbook platform, available online and in an app, which allows consumers in North Carolina to place bets on virtually any professional sport or athlete, and consumers in all other states where such betting is legal, including New York, to view active bets on the platform.

## FACTUAL ALLEGATIONS

### A. Sports Betting in the United States

14. Gambling was legalized in Nevada in 1931, and sports betting in particular was legalized in 1949. For decades afterwards, Nevada's casinos were the only places in the United States where Americans could legally place sports bets.

15. The process for placing a bet in person at retail sportsbooks, which are usually located inside casinos, has remained largely the same since 1949: a bettor goes to the sportsbook, reviews large boards or screens that list out the active bets, selects their bets, and provides their selected bets and payment to either a clerk, or, in more technologically savvy sportsbooks, to a self-serve kiosk. The boards listing the active bets display nothing but the bets themselves—there are no team logos, no photos of the athletes, and not even so much as an icon representing the sport on which the bet is placed. What was true in 1949 remains true in 2024: a bettor did not need a picture of Mickey Mantle (or Juan Soto) to place a bet.

16. The Professional and Amateur Sports Protection Act ("PASPA") was passed in 1992, which outlawed sports gambling in all states except Nevada, and in 2006, the Unlawful Internet Gambling Enforcement Act was passed, which forbade companies from knowingly

5

accepting payments in connection with online betting. Post-PASPA, legal sports betting flourished in Nevada, with the market almost doubling from $1.8 billion to $3.9 billion.

17. Nevada continued to accelerate the growth of this market in 2010 when, eight years before all other states were allowed to legalize online sports betting, it introduced its first online sportsbook. The state saw a sharp increase in sports betting immediately afterwards, especially among younger adults. For example, a 2011 study by the Annenberg Public Policy Center at the University of Pennsylvania found that monthly usage of online gambling sites among college-aged men increased from 4.4% in 2008 to 16% in 2010.[1] Online sports betting removed all potential hurdles to placing bets. A bettor no longer had to go to a casino, wait in line, and fill out a form; rather, they could just press a button on their computer or smartphone and place a bet instantly. This accessibility, combined with widespread legalization of sports betting, would lead to the drastic growth of the sports betting industry after 2018.

**B.    The Legalization of Sports Betting and Rise of Online Sports Betting**

18. In May 2018, the Supreme Court legalized sports betting in *Murphy v. National Collegiate Athletic Association*. The decision, which overturned PASPA, allowed states to legalize sports betting and resulted in the rapid geographic and economic expansion of the industry.

19. Following the ruling, sports betting was legalized in 38 states and the District of Columbia, and continues to expand, with active legislation currently introduced in two additional states.[2] 30 of these 38 states, as well as the District of Columbia, offer online and mobile sportsbook betting, with active legislation aiming to legalize such betting currently introduced in

---

[1] Annenberg Public Policy Center, *The Unrecognized Risks of Gambling for Male High School Athletes* (Apr. 27, 2011), https://cdn.annenbergpublicpolicycenter.org/Downloads/Releases/ACI/High%20School%20Male%20Athletes%20Helped%20Drive%20Recent%20Poker%20Craze%20final.pdf.

[2] American Gaming Association Sports Betting Map, https://www.americangaming.org/research/state-gaming-map/.

6

three additional states.[3] One such state is New York, which launched online sports betting on January 8, 2022.

20. The sports betting market is booming, and betting figures have increased year after year, both on a state and national level. Americans spent more than $220 billion on sports betting within five years of *Murphy* being decided,[4] and the American Gaming Association reported that 28.7 million American adults intended on placing a wager using an online sportsbook for this past Super Bowl alone.[5] The industry has also been immensely profitable for the state of New York—in the first quarter of 2024, the state saw $496 million in gaming revenue.[6]

21. Online sportsbook betting platforms, such as the FanDuel Sportsbook and Underdog Sportsbook apps and websites, offer bets on the outcomes of multiple sports, based on odds those companies set. They also offer prop bets, or bets based on individual athletes' performances (*e.g.*, how many home runs a baseball player will hit in a season) or occurrences within games (*e.g.*, how many total home runs will be hit by a team during a baseball game).

22. FanDuel initially focused on daily and weekly fantasy sports and expanded into online and retail sportsbook betting after the 2018 *Murphy* decision, an expansion that has been immensely profitable for the company. Underdog started primarily as a provider of fantasy sports when it was founded in 2020, but shortly after began focusing on sportsbook betting.

23. Both FanDuel and Underdog have reaped the benefits of the expanding online sportsbook betting marketplace. FanDuel launched its FanDuel Sportsbook platform on September

---

[3] *Id.*

[4] American Gaming Association, *Five Years Post-PASPA: Consumer Sports Betting Trends* (May 9, 2023), https://www.americangaming.org/resources/five-years-post-paspa-consumer-sports-betting-trends/.

[5] American Gaming Association, *Super Bowl LVIII Wagering Estimates* (Feb. 6, 2024), https://www.americangaming.org/resources/super-bowl-lviii-wagering-estimates/.

[6] American Gaming Association, *2024 Q1 Commercial Gaming Revenue Tracker*, https://www.americangaming.org/wp-content/uploads/2024/05/Q1-2024_CGRT.pdf.

7

1, 2018 in New Jersey and expanded into New York on January 8, 2022, the day online sportsbook betting was legalized in the state. According to publicly reported financial information, the U.S. division of Flutter—of which FanDuel constitutes the vast majority of the revenue—made $4.484 billion in revenue, comprising 38% of the company's total revenue in 2023.[7] Additionally, Flutter "had a 43.2% share of the online sports betting market in the states where FanDuel sportsbook was live" as of December 31, 2023.[8] In July 2022, Underdog announced that it had reached a valuation of $485 million after a Series B round of fundraising, which it intended to use to, among other things, "build innovative licensed sports betting products"[9], and CEO Jeremy Levine has announced the company's intentions to "be the biggest company in the [online sportsbook betting] space."[10] Underdog launched its Underdog Sportsbook platform on March 11, 2024.

        C.    **MLBPI's Group Licensing Structure**

24. Professional baseball players spend their lives and careers developing the specialized skills necessary to succeed at the professional level. One of the most important rewards for the small number of players who play professional baseball is the establishment of a personal and professional identity. MLB players benefit from approved uses of their public personas by sponsoring and supporting causes and institutions that are meaningful to them, and also use their public personas and identities for commercial benefit and for the benefit of their union (the MLBPA) through means such as licensing and promotional agreements negotiated by MLBPI on their behalf.

---

[7] Annual Report of Flutter Entertainment PLC. for Fiscal Year ended December 31, 2023 (Form 10-K) at 83 (Mar. 26, 2024).

[8] *Id.*

[9] PR Newswire, "Underdog Raises Series B Funding with $485M Valuation" (July 26, 2022), https://www.prnewswire.com/news-releases/underdog-raises-series-b-funding-with-485m-valuation-301593301.html.

[10] SBC Americas, "Underdog CEO Speaks on the Assault Against Picks-Style Fantasy Games" (Oct. 5, 2023), https://sbcamericas.com/2023/10/05/underdog-ceo-levine-fanduel/.

25. For professional athletes, the ability to control the commercial use of their names, images, and likenesses (commonly referred to as the "right of publicity") is a crucial return on their substantial career investment. It also enables athletes to avoid being associated with companies, commercial products, and industries that they do not wish to be perceived as supporting and endorsing.

26. MLBPI is the exclusive group licensing agent for all active MLB players. Each active MLB player has assigned to MLBPA, and in turn to MLBPI, the exclusive, worldwide right to use, license, and sublicense, among other things, the players' names, images, and likenesses for purposes of any commercial marketing, promotional activity, product, or service in which three or more MLB players are identified over the course of a calendar year. Any use of the aforementioned protected attributes of three or more players in connection with commercial activities must be licensed through and authorized by MLBPI.

27. In its role as licensing agent, MLBPI regularly negotiates group licensing agreements authorizing use of MLB players' rights in a range of commercial products and services. These agreements ensure that players are associated only with brands, products, and services that they choose to support; that the commercial value of their rights is neither tarnished nor diluted through misuse or overuse; and that the MLBPI and players receive fair compensation when the players' images are used to increase the consumer appeal of a brand, product, or service.

**D. Defendants' Unauthorized Uses of MLB Player Images on Their FanDuel Sportsbook and Underdog Sportsbook Platforms and in Related Advertising**

28. The FanDuel Sportsbook and Underdog Sportsbook apps and websites feature the image of almost every current MLB player. These images are specifically used in connection with prop bets on both Defendants' platforms. For example, on Underdog Sportsbook, each game has

9

a series of prop bets a user can place on each MLB player in the lineup for that game. The relevant MLB players' images are used on all of these pages.

*Underdog Sportsbook: "total bases" prop bet page for September 9, 2024 Kansas City Royals vs. New York Yankees game; "home runs" prop bet page for September 9, 2024 New York Mets vs. Toronto Blue Jays game.*

 

29. FanDuel Sportsbook structures its prop bets in a near-identical manner: with a list of every player in the lineup next to their image.

*FanDuel Sportsbook: "home run" prop bet page for September 9, 2024 Kansas City Royals vs. New York Yankees game; "4+ total bases" prop bet page for September 9, 2024 New York Mets vs. Toronto Blue Jays game.*




30. FanDuel Sportsbook has even had entire pages of prop bets dedicated to MLB teams such as the New York Mets, which aggregates all bets involving those teams and includes images of their players.

11

*FanDuel Sportsbook Mets prop bet page, displaying prop bets pertaining to their August 9, 2024 game against the Seattle Mariners.*



31. Additionally, on both the FanDuel Sportsbook and Underdog Sportsbook platforms, MLB player images are featured on individual player pages accompanying the player's statistics and playing records.

*Aaron Judge's player page on Underdog Sportsbook.*   *Pete Alonso's player page on FanDuel Sportsbook.*




32. On both FanDuel Sportsbook and Underdog Sportsbook, clicking on the player's image takes users to a page of prop bets pertaining to such player. Use of player images in this manner serves no purpose other than to increase user interest and entice the user to click into prop bet pages and place bets.

33. Sportsbook betting is big business. The more customers that use and place bets on a sportsbook platform, the more money the sportsbook makes. Player images are not necessary for this business to function. The core information bettors require to make informed decisions—such as an athlete's name, past and current performance, and relevant statistics—can be fully conveyed through data alone. In fact, most serious bettors focus only on data in determining what bets to place, including quantitative factors such as performance metrics, matchups, and injury status, among others. These bettors do not consider a player's picture when making their bets, as an image cannot convey any relevant statistics about said player or their condition, and therefore does

13

nothing to improve their understanding of the bet and does not impact their decision-making process in any way.

34. Indeed, neither FanDuel Sportsbook nor Underdog Sportsbook feature player images of any kind for football, despite the fact that the 2024-25 NFL season recently began and the same types and breadth of bets are available on the platforms for football as they are for baseball, and despite the fact that the NFL is the most popular sport to bet on in America. Defendants are instead using MLB player images on their platforms for their own commercial advantage, as a means of associating their platforms more closely with these MLB players, to entice users to place bets when on the websites or apps.

*Example prop bet pages on FanDuel Sportsbook (left) and Underdog Sportsbook (right), neither of which use NFL player images.*

 

14

35. Defendants' use of player images on the platform is intended to capitalize on those player's identities and use them to drive business to the FanDuel Sportsbook and Underdog Sportsbook platforms, despite the fact that MLBPI has not granted Defendants a license.

36. Further, Underdog uses MLB player names and images in advertising for its sportsbook platform. Underdog Sportsbook, which advertises through the company's primary Underdog Fantasy accounts (likely due to the significant difference in followers—82,700 on Underdog Fantasy compared to only 269 on Underdog Sportsbook), explicitly advertises prop bets using player images on its social media, often by posting a specific prop bet that users can place on an MLB player.

*March 17, 2024 Instagram post by Underdog Fantasy advertising a prop bet on Aaron Judge*



15

37.　Underdog Sportsbook also often runs promotions on MLB players, which are advertised with stylized social media posts featuring an image of the player and details about the promotion. These promotions often offer users of the platform increased payouts or other rewards in exchange for the user making a bet on the featured player.

*2024 Underdog Fantasy promotional Instagram posts*
*featuring MLB players Juan Soto, Bryce Harper, and Paul Skenes*





38.　Underdog's usage of player names and images in advertisements for the platform is intended to capitalize on those players' identities and use them to drive business into Underdog Sportsbook platform, despite the fact that MLBPI has not granted Underdog a license.

39.　Because Defendants have used well over three MLB players' images over the course of a single calendar year in a commercial context, FanDuel and Underdog were required to have obtained a license from MLBPI for such uses, but did not do so.

40.　FanDuel and Underdog knowingly appropriated the images and likenesses of three or more MLB players, and willfully disregarded MLBPI's rights in using these players' images and likenesses in their FanDuel Sportsbook and Underdog Sportsbook platforms, without MLBPI's consent or authorization. Further, Underdog at all relevant times knowingly appropriated

16

the names, images, and likenesses of three or more MLB players, and willfully disregarded MLBPI's rights in using these players' names, images, and likenesses in advertising and promotion for its sportsbook platform, without MLBPI's consent or authorization. And any use by FanDuel of player names, images, or likenesses in advertisements for the FanDuel Sportsbook platform in a manner that has not been specifically licensed and/or approved would constitute a misappropriation of rights of publicity.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Misappropriation of Rights of Publicity

41.  MLBPI incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

42.  New York Civil Rights Law § 50 provides for a cause of action against corporations that "use[] for advertising purposes, or for the purposes of trade, the name, portrait, picture, [or] likeness [] of any living person without having first obtained the written consent of such person." N.Y. Civ. Rights § 50. New York Civil Rights Law § 51 provides for damages and injunctive relief for a violation of § 50.

43.  MLBPI has the right and license to use the group licensing rights described herein, including the right to grant sublicenses of those rights. MLBPI also has the right to prosecute claims and suits in its own name to protect those rights. As such, MLBPI has standing to bring claims for misappropriation of these MLB players' rights of publicity on MLBPI's behalf and on behalf of the MLB players who assigned their rights to MLBPI.

44.  MLB players' names, images, and likenesses have commercial value.

45.  Defendants knowingly and without consent used the images of three or more MLB players within their respective sportsbook betting platforms.

17

46. Underdog knowingly and without consent used the names, images, and likenesses of three or more MLB players for the purposes of promoting and advertising its sportsbook platform.

47. Because MLBPI is the exclusive group licensing agent for current MLB players, New York Civil Rights Law § 50 required Defendants to obtain MLBPI's prior written consent before using the MLB players' names, images, and/or likenesses in the manner described above.

48. Defendants' actions as alleged herein are outrageous, malicious, and in willful violation of MLBPI's rights.

49. Defendants' violations of applicable and governing state law for its unauthorized use of MLB players' identities for commercial purposes entitles MLBPI to recover equitable and monetary relief in an amount to be proven at trial to remediate such violations on behalf of the MLB players who have assigned their group licensing rights to MLBPI. N.Y. Civ. Rights §§ 50, 51.

## PRAYER FOR RELIEF

**WHEREFORE**, MLBPI prays for the following relief:

1. Preliminarily and permanently enjoining Defendants from continuing to use MLB player images and likenesses in their sportsbook platforms;

2. Preliminarily and permanently enjoining Underdog from continuing to use MLB player names, images, and likenesses in advertising and promotions for its sportsbook platform;

3. Preliminarily and permanently enjoining FanDuel from using MLB player names, images, and likenesses in advertising and promotions for its sportsbook platform in a manner that has not been specifically licensed and/or approved;

4. Compensatory and punitive damages in an amount to be determined at trial;

5. An award of reasonable attorneys' fees, costs, and disbursements; and

6. Any other relief as this Court deems just and equitable.

Dated: September 23, 2024
New York, New York

By: */s/ Jeffrey L. Kessler*

**WINSTON & STRAWN LLP**
Jeffrey L. Kessler
David L. Greenspan
Robert S. Pannullo
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com
rpannullo@winston.com

Diana H. Leiden (*pro hac vice* forthcoming)
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
dhleiden@winston.com

*Counsel for Plaintiff MLB Players Inc.*